## VAN KANNEL REVOLVING DOOR CO. v. REVOLVING DOOR & FIXTURE CO.

(Circuit Court of Appeals, Second Circuit. December 15, 1914.)

No. 44.

1. PATENTS ⬥328—VALIDITY AND INFRINGEMENT—REVOLVING DOOR.
   The Van Kannel patent, No. 656,062, for a revolving door, discloses patentable invention and is valid; also *held* infringed.

2. PATENTS ⬥328—INVENTION—REVOLVING DOOR.
   The Van Kannel patent, No. 836,843, for a collapsible revolving door, *held* void for lack of invention.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon cross-appeals from a decree of the District Court, Southern District of New York. Complainant brought suit for infringement on two patents, issued to Theophilus Van Kannel, No. 656,062, on August 14, 1900, for a revolving door, and No. 836,843, on November 27, 1906, for a collapsible revolving door. The court held that claims 1, 2, 3, and 8 of the first patent, and claims 13 and 14 of the second patent, were valid and infringed, and that claims 1 and 2 of the second patent did not disclose patentable invention. Both sides appealed.

The following is the opinion of Mayer, District Judge, in the District Court:

Theophilus Van Kannel was a prolific inventor of revolving doors; his first patent having been granted on August 7, 1888, upon an application filed in February of that year. On August 14, 1900, there was issued to Van Kannel patent No. 656,062, and on November 27, 1906, patent No. 836,843. These two patents were duly assigned to Van Kannel Revolving Door Company of West Virginia. That company had some financial difficulties, and ultimately the patents became the property of the complainant herein, a New Jersey corporation.

The defendant company installed a door at No. 170 Broadway, borough of Manhattan, New York City, which complainant asserts was an infringing structure. Mr. Ely, president of the defendant company, in his testimony frankly gave a description of this door which reads on the claims in con-

troversy. From this description, I think it is clear that, if valid, the claims of both patents here under consideration have been infringed. The sole question really in controversy is whether these patents disclose invention.

Van Kannel seems to have been the pioneer in this revolving door art, and his first patent, No. 387,571, August 7, 1888, covered a revolving storm door structure which consisted, broadly speaking, of a circular casement and a floor and ceiling in which was fitted to revolve a spindle, having three or more radiating wings, with side edges contacting with the circular casement, and whose upper and lower edges contacted with the floor and ceiling, and so spaced apart that, no matter in what position the revolving structure might be left after ingress to or egress from the building, the door passage would always be closed.

Van Kannel had in mind the possibilities of a panic, for he stated in his specification: "There are cases when the structure may only be intended for temporary use, and in such cases the entire structure may be removable. For instance, in Fig. 3 I have shown a structure the base of which is mounted on suitable wheels or casters, the structure being moved up to the doorway and secured thereto, if desired, by suitable hooks, catches, or other fastenings : a structure of this character being especially available for use at the doors of churches, theaters, and halls, so that it can be moved entirely out of the way to permit free exit when the audience or congregation is leaving the building. Where a temporary structure of this sort is used, the fastenings whereby the same is attached to the doorway should be of such a slight character that they can be readily broken or torn from their places in the event of a sudden rush against the door structure from the inside of the building, so that no obstacle to free egress will be afforded in the event of a panic. When one or more of the doors is hinged, it becomes necessary to brace the same, so that the door structure will preserve proper rigidity under ordinary circumstances, and although a rigid brace may be used for this purpose, such brace would have to be detached when the doors were swung back; hence I prefer to use as braces chains or ropes, which, being flexible, can hang down when the hinged doors are swung back, so that only one of the chains need be detached in order to free both doors."

The art was new, and the "panic proof" expedient was crude. The patent showed a revolving door with three wings, arranged so that, no matter in what position the door was left, the entrance was always closed. Van Kannel provided one way hinges for folding two of the wings, so that these wings could be folded against the third. These wings were rigidly secured by means of chains, and he attached the whole structure, ceiling and casement, to the building in such a way that, in case of a panic, the whole structure, without regard to the folding of the wings, could be broken away from the building and pushed into the street. In view of our present information, this method would doubtless prove clumsy, destructive, and inexpedient.

From 1888 until August 14, 1900, the date of the first patent here under consideration, there was apparently quite some activity in this art, as is evidenced by further patents to Van Kannel, as well as to Ife. Van Kannel, No. 588,620, dated August 24, 1897; Van Kannel, No. 588,888, dated August 24, 1897; Ife, No. 595,948, dated December 21, 1897; Ife, No. 596,029, dated December 21, 1897. We must therefore consider the first patent in suit in the light of what was or was not accomplished during this period of a dozen years intervening between the initiation of the art and the granting of the letters of August 14, 1900.

Van Kannel, in the specification of letters patent No. 656,062, shows that his invention is directed solely to the question of a so-called panic-proof door. He states: "My invention consists of certain improvements in that class of revolving doors which have a series of radiating wings rotating in a casing, the object of my present invention being to so construct the wings and casing of such a door that they will yield to the rush of a panic-stricken crowd: the end portions of the casing swinging outward and the wings of the door all being pushed to the front, so as to provide a wide and unobstructed passage on each side of the center of the door structure."

The claims relied on are as follows:

"1. The combination, in a revolving door, of a structure having wings mounted so as to be revoluble around a central axis in fixed radial relation

thereto, said wings having also independent hinges so disposed that all of the wings may be folded and lie side by side, so as to project in one direction from the center.

"2. The combination, in a revolving door, of a structure mounted so as to rotate about a central axis, a series of wings mounted so as to swing independently of their joint rotating movement about said axis, and self-releasing locking devices, whereby said wings are normally retained in fixed radial relation to said central axis.

"3. The combination, in a revolving door, of a series of wings mounted so as to rotate about a central axis, each of said wings being hinged so that the series may be folded side by side, and may project in one direction from the general axis of rotation, and means for locking said wings in position when they have been swung apart from each other."

"8. The combination, in a revolving door, of a center post with radiating wings normally locked to said center post, but mounted so that they will be automatically unlocked therefrom and swung forwardly to project side by side when a pressure is exerted upon them in other than a normal direction."

In claim 1 the predominant thought is to accomplish a result whereby all of the wings may be folded and lie side by side, so as to project in one direction from the center. In claim 2 the inventor refers to self-releasing locking devices. Claims 3 and 8 are directed to the same subject-matter; claim 8 being drawn in especially clear phraseology. Construing claim 3 in a highly technical way, one might say that it was anticipated by the patent of 1888; but this claim should not be torn from the context, and, if fairly construed, in connection with the context, I think that claim 3 may stand.

Briefly stated, what Van Kannel accomplished in this patent of August 14, 1900, was the construction and mounting of the wings themselves upon the central basis or spindle, in such manner that they could all be folded to lie in one direction and be braced apart normally by devices (called automatic or self-releasing), so that when abnormal pressure was brought against the wings they would fold and permit a panic-stricken crowd to pass out of the door. This, it seems to me, was an advance so marked that it rose to the dignity of invention. The expert for the defendant criticised the use of the terms "automatic" and "self-releasing," contending that the devices were not automatic nor self-releasing; but these devices are for all practical purposes automatic, because it is intended that they shall be released by the abnormal pressure exerted by an unthinking excited crowd.

The defendant urges that an analysis of the elements of the combination of this patent of August 14, 1900, will demonstrate that, as against the patent of 1888, this is double patenting; and it further contends that the idea of a turnstile is old, as is also the idea of making a door or similar device with fastening which will yield to pressure, or break because of pressure, in time of danger. But the answer is one so frequently given: Why did not Van Kannel, Ife, or any one else think of the combination of No. 656,062 during the dozen years? Van Kannel in his first patent had seen the necessity of providing against the danger which would be occasioned by a panic-stricken crowd; but his solution of that problem was not efficient, and it must be assumed that others thought the result in that particular accomplished by the first Van Kannel patent could not be improved upon. An analysis of the previous Van Kannel and Ife patents, above referred to, will show that none of them contemplated nor disclosed the subject-matter of the claims of the first Van Kannel patent here in controversy. Of the other patents cited as a part of the prior art, none need be considered, except the Ryan patent, No. 516,121, dated March 6, 1894. This patent, I think, relates to a remote art: but, even if deemed applicable, it does not anticipate, nor does it contain any disclosure sufficient to deprive Van Kannel's patent of invention.

The Ryan patent is for a drawbridge gate, and the object thereof was to provide a means for closing automatically the roadway and pathway of the approaches to the drawbridge, so as to prevent pedestrians and teams from falling into the water. The normal position of the gates is open, and then, of course, the bridge can be crossed by teams or pedestrians. What Ryan sought to accomplish was the prevention of injury to those who happened to be on the path or roadway when the approach to the draw was being closed; and

it may be said that he was dealing with a situation exactly opposite to that which Van Kannel was considering.

For the reasons outlined, I am of the opinion that the four claims above referred to are valid and infringed.

A much more difficult question arises when No. 836,843, of November 27, 1906, is considered. Here Van Kannel states: "The present invention relates to that class of revolving doors which are fitted between opposite segments of a casing in a doorway to permit the movement of persons through the doorway without the access of wind and dust. The object of the invention is to make the door wings collapsible when abnormal pressure is applied to any of the wings, so that in case of emergencies the doors may be collapsed automatically and swing to one side of the spindle, leaving open passages at opposite sides of the same for rapid ingress or egress. Revolving doors of such construction are thus suitable for use at the entrance of theaters, assembly halls, and retail stores, where it is desirable to exclude wind and dust, and where in case of panic it is equally important to furnish a free egress for the audience. Any rush of persons against the revolving doors operates in the present invention to collapse the doors automatically, whatever point in the doors be pressed upon, as the construction operates, without any skill or knowledge on the part of such persons, to detach the ties or other means employed for holding the door wings in their normal or radial positions. The adjacent faces of the wings are shown herein connected by flexible ties formed of wire rope and made adjustable as to length to set the wings at an equal distance from one another. One end of each tie is held to the wing detachably, and the fastening device for such end is hinged upon the wing, so that it may be moved outwardly to re-engage the tie whenever detached. The wings in the present invention are pivoted upon the central spindle in a novel manner, by providing a grooved disk near each end of the spindle and furnishing each wing with two fulcrum pins adapted each to engage the groove in one of the disks. A pinion is provided upon the spindle adjacent to each disk, and a toothed segment meshing with such pinion is attached to each of the wings and made concentric with the fulcrum pin, and the fulcrum pins are thus enabled to change their position upon the fulcrum plate when the wings are moved from their normal position by their constant engagement with the groove in the disk during the rolling of the segment upon the teeth of the pinion. The pins upon which the wings are supported are termed 'fulcrum pins' herein, as the doors are supported upon them and turn upon them during the swinging movement of the wings when collapsed. The boxes by which the pins are fixed upon the doors are termed 'fulcrum boxes,' and the disks which support the pins upon the spindle are termed 'fulcrum-disks.' "

The claims in suit are:

"1. In a revolving door, a central spindle, a series of wings pivoted thereto, and fixtures connecting the adjacent sides of the wings, and provided with automatically detachable fastenings adjusted to permit the automatic collapsing of the wings under abnormal pressure.

"2. In a revolving door, the combination with a suitable casing and a central spindle of a series of wings pivoted thereto, and ties attached to the adjacent sides of the wings, and secured by detachable fastenings adapted to hold the wings normally in a radial position upon the spindle, and adjusted to release the wings when subjected to abnormal pressure, to permit the collapsing of the wings."

"13. In a revolving door having collapsible wings, the combination, with a strap or cord fastened upon one wing, of a fastening device upon the adjacent wing, arranged and operated to grasp the end of such strap detachably and to resist the normal pressure upon the wings, and adjusted to release the strap under abnormal pressure, whereby the wings are automatically collapsed under such pressure.

"14. In a revolving door having collapsible wings, the combination, with a strap or cord fastened upon one wing and having a knob upon the end, of a fastening device upon the adjacent door comprising an abutment for one side of the knob, and a spring gripper opposed thereto and adjusted to retain the knob under the normal operation of the doors, and to release the knob under abnormal pressure, to permit the automatic collapsing of the doors."

In studying this second patent both as to structure and as to claims, it is to be noted that there is no evidence of manufacture under nor utility of the first patent (August 14, 1900). It will not be disputed that, in large centers there has been an increase of great buildings housing thousands of people, and that the mind of inventors would naturally turn to devising a door which would be a practicable commercial structure from the point of view of architectural requirements and cost of construction, and at the same time would possess efficient panic-proof features.

Looking at the structures of the first and second patents here concerned, what was the accomplishment of the second over the first? In the first patent each wing is provided with an independent, self-releasing locking device, and the wings, in the event of panic, are released from the ceiling separately, in order to hold the position shown in Figure 3 of the first patent. In the construction of the second patent in suit, the arrangement of the self-releasing locking device between the adjacent faces of the wings makes possible the collapsing of the wings to panic position after the release of a single fastening. Aside from this advantage, the parts are in a position for ready readjustment or the re-establishment of the door in operative position after collapsing.

The releasing of one of the straps or cords releases the wings, so that they may all be folded to panic position, no matter from what point of the door structure the releasing force may be applied; and this also facilitates the ready return to position of the three wings between which the connection has not been broken in any one collapsing operation. This cannot be said of the mode of operation of the first patent in suit, wherein each wing must be individually re-established to its radial position, which, while possible, would probably be accomplished only by aid of a stepladder, in view of the connecting means being positioned on the ceiling of the door.

Having noted the structural differences between No. 656,062 and No. 838,843, it becomes necessary next to read the claims, remembering, of course, that we are considering a combination. Analyzed even from the standpoint of liberal construction, claims 1 and 2 merely show change of location of the devices, in that there are "fixtures connecting the adjacent side of the wings" (claim 1) or "ties attached to the adjacent sides of the wings."

It seems to me that, in view of the disclosures of the August 14, 1900, patent, a man skilled in the art would naturally experiment to determine the location of the devices, that the result attained would not be invention, but merely the product of capable mechanical improvement, and that it will not do to extend the control of this art to any such comprehensive scope as is sought under these two claims.

Claims 13 and 14, however, state a combination of elements from which we have, apparently, a new structure in commerce, a new result for operative panic-proof doors, and all described with words of limitation sufficiently definite and limited to save the combination from all the prior art. Randall, 209,713, of 1878; Weaver, 319,532, of 1885; Van Kannel, 387,571, of 1888; Ryan, 516,124, of 1894; Van Kannel, 588,620, of 1897; Ife, 595,948, of 1897; Ife, 596,029, of 1897; Van Kannel, 641,563, of 1900; Van Kannel, 656,062 of August 14, 1900.

Even if doubt existed as to claims 13 and 14, that doubt must be resolved in favor of validity, in view of the presumption arising from the grant and from the utility of the structure as established by the testimony.

In view of the conclusions indicated, complainant may have a decree in accordance herewith, with half costs.[1]

T. W. Johnson, of Washington, D. C., for complainant.

C. G. Campbell, of New York City, for defendant.

Before LACOMBE, COXE, and WARD, Circuit Judges.

[1] It will be noted that the motion to strike out the testimony as to "panic-proof" was granted. In taxing disbursements, those incurred in connection with the "panic-proof" testimony will be deducted, and the balance will constitute the principal sum on which the half costs will be figured.

LACOMBE, Circuit Judge. [1] Judge Mayer has quoted quite fully from the patents and has set forth the eight claims involved; it will not be necessary to restate them here. Van Kannel was apparently a pioneer in the art of "revolving" doors, as distinguished from swinging doors. The revolving door has a series of radiating wings which rotate in a casing; the wings fit snugly in the casing, so as effectually to prevent the entrance of wind, rain, snow, or dust, either when the door is closed or when persons are passing through it. It is noiseless, and cannot be blown open by the wind, as the wind pressure is equal on both sides of the center of motion. It can be moved without noticeable resistance, as it requires no springs or weights to restore it to its closed position or any bumpers to prevent slamming. At it moves in but one direction, there is no possibility of collision when persons are passing both in and out at the same time. These features are all disclosed in an early patent to Van Kannel, No. 387,571, dated August 7, 1888, which has long since expired. That patent also provides for hinging one or more of the wings at a point near the central part, so that said wings can be thrown back against the fixed wing, thereby providing a clear opening through the structure to permit the carrying of a long object, like a ladder, in or out through the same, and also to provide for the circulation of air in the event of the occurrence of a suddenly warm day in the spring or fall, after the solid wings have been applied to the door.

There was one difficulty inherent in this structure: It could not move if pressure from one direction were applied simultaneously on both sides of the center of motion. That is the reason no gust of wind could blow it open. In the event, however, of a panic occurring within the building, followed by a rush to the door, pressure would be applied outwards on both sides of the center of motion, the door would not revolve, and egress from the room through the doorway would be blocked. This obvious danger connected with the use of revolving doors was not overlooked by Van Kannel, who in his 1888 patent undertook to avoid it by making his door and casing independent of the building, being mounted on wheels and held in the doorway by hooks or catches of light structure which would give way under abnormal pressure, allowing door, casing, and the front files of the crowd to roll out into the street together.

The first patent sued upon here discloses an improved method of adapting the door to a condition of panic. Each wing is hinged near the center of rotation and held normally in such relation to the rest of the wing that, when abnormal pressure comes, the holding parts will disengage and the hinged portions will swing forward, making a wide and unobstructed passage on each side of the central post on which the wings revolve. We fully concur with Judge Mayer in the conclusion that this patent (656,062) discloses patentable invention. The panic device of 1888 was crude and manifestly dangerous; the defect of the revolving door (jamming when a panic rush came against it) was obvious; during the 12 ensuing years patents for various improvements were taken out by Van Kannel and others, but none of them remedied the difficulty, which it must be presumed they were all trying to do, be-

cause, until that was remedied, the revolving door system was seriously handicapped. It is unnecessary to add anything to Judge Mayer's discussion of this patent and its claims. Defendant is clearly wrong in his contention that the device actually shown in this patent of 1900 is not automatic or self-releasing, as the claims describe it, but is a "weak or breakable device merely." When the abnormal pressure comes, nothing *breaks*, the holding devices are merely pulled or pushed out of engagement with other parts, and restoration of conditions is accomplished merely by re-engaging them, uninjured by temporary disengagement.

[2] The second patent in suit is evidently an attempt to extend the monopoly of the earlier patent by changing the names of the various elements. The District Judge found that its broader claims involved merely a change of location of holding devices, which did not rise to the dignity of invention. The narrower claims (13 and 14) disclose nothing but a combination of old elements which would be evident to an ordinary mechanic.

The decree is modified, so as to reverse as to these two claims and affirm as to all the others. No costs of this appeal to either side, as neither has prevailed as to all the claims in controversy.